RECEIVED
IN LAKE CHARLES, LA.

APR 29 2013

TONY R. MOORE, CLERK
BY _____
                DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

SOUTHWEST LOUISIANA            :    DOCKET NO. 2:10-CV-902
HOSPITAL ASSOCIATION d/b/a
LAKE CHARLES MEMORIAL
HOSPITAL

VS.                            :    JUDGE MINALDI

BASF CONSTRUCTION             :    MAGISTRATE JUDGE KAY
CHEMICALS, LLC

## MEMORANDUM RULING

Before the court are a Partial Motion for Summary Judgment from the plaintiff,

Southwest Louisiana Hospital Association ("Hospital") [Doc. 40] filed on January 22, 2013, and

a Motion for Summary Judgment from the defendant, BASF Construction Chemicals, LLC

("BASF") [Doc. 41], filed on January 22, 2013.  BASF timely filed an opposition to the

Hospital's motion [Doc. 44] as did the Hospital for BASF's motion [Doc. 46], on February 11,

2013.  Both the Hospital [Doc. 50] and BASF [Doc. 52] and also filed replies for their respective

motions on February 25, 2013.  The Hospital filed a motion for hearing [Doc. 48], and the

undersigned heard oral argument on the two motions on Tuesday, April 2, 2012 at 10:00 a.m.

The court granted portions of both parties' motions,[1] and took the remainder of the issues under

advisement.  For the foregoing reasons, the Hospital's Partial Motion for Summary Judgment is

GRANTED and BASF's Motion for Summary Judgment is DENIED.

---

[1] During the hearing, the undersigned granted as unopposed the portion of the Hospital's motion which argued that the iron pyrite in the EIFS was a product defect.  The undersigned also granted as unopposed the portion of BASF's motion which asserted that the Hospital did not have an actionable La. Civ. Code Ann. art. 2529 claim. Accordingly, these issues will not be discussed in this ruling.  *See* Minutes from Motion Hearing, [Doc. 58].

## FACTUAL BACKGROUND

This case arises from the installation of a defective architectural wall system, referred to as Exterior Insulation Finish System ("EIFS") on the outer walls of the Hospital's Women & Children's Hospital facility ("facility") at the corner of Gauthier and Nelson Road in Lake Charles, Louisiana.  The EIFS was manufactured by Finestone, but the defendant BASF is the successor-manufacturer for the product (via a merger on April 1, 2010), and thus appears as the named defendant in this case.[2] The Hospital originally filed this action on April 29, 2010 in the Fourteenth Judicial Court of Calcasieu Parish, and BASF subsequently removed it to this court based on diversity jurisdiction soon thereafter.[3]

### A. Construction of the Facility (2001-2003)

In 2000, the Hospital contracted with Bessette Development ("Bessette") to construct a three-building facility (containing a Utility building, Medical Office building, and Hospital building) at the corner of Nelson and Gauthier Roads in Lake Charles, Louisiana.  Bessette, in turn, bid out portions of the building project to subcontractors.  Eventually, Bessette selected Robbins Contracting ("Robbins")[4] to construct the exterior walls of the facility.  Robbins and one of the Hospital's architects, Michael Pomarico, then decided to use a Finestone Pebbletex EIFS product as the outer wall cladding system for the facility.[5]  In mid 2001, Pomarico and Bessette reviewed and approved "Finestone EIFS submittals" from Robbins, which contained,

---

[2] *See* Stipulation, Ex. D to the Hospital's Motion for Summ. J., [Doc. 40-3] at p. 13.

[3] *See* Not. of Removal, [Doc. 1].

[4] The Hospital asserts that Robbins is an "approved Finestone applicator."

[5] EIFS is made out of 1) Styrofoam insulation board; 2) a mesh screen material which is embedded into a cement material referred to as the base coat; and 3) a sand aggregate material, referred to as the finish coat, which is typically applied with a trowel over the base coat. These separate components are adhered together onto a substrate.

among other things, example warranty language, before acquiring the EIFS.[6]  At this point,

Pomarico's main requirement for the EIFS was that it should have a ten-year warranty.  Robbins

subsequently purchased the EIFS materials from an EIFS supplier, F&W Architectural Products

("F&W") and began applying the EIFS to the facility in 2001, completing the project on or about

January 14, 2003.

### B.  Discovery of Defect: "Weeping" Rust Stains in EIFS (December 2002)

Unfortunately, the EIFS finish coat contained iron pyrite particles that quickly began to

rust, soon after the application of the EIFS to the buildings and before the construction of the

facility was completed.  On December 17, 2002, Robbins notified F&W of the rust appearing at

the facility.[7]  In the meantime, on December 19, 2002, the Certificate of Substantial Completion

was issued for the facility.  In response to the rust, a complaint initiation form was then sent on

December 30, 2002, noting "rust on the EIFS" and requesting a remedy to the problem.[8]  At the

time the Hospital became aware of the problem and made a warranty claim, Finestone had not

even issued a written warranty to the Hospital.  Robbins then sent a January 14, 2003 fax to

F&W, asking for the EIFS Warranty.[9]  The actual written EIFS warranty (a "Limited Warranty"

for a term of ten years)[10] was not delivered to the Hospital until April 28, 2003, but was dated

---

[6] *See* "Submittals," Ex. T to the Hospital's Reply Mem., [Doc. 50-1], at pp. 61 – 76.

[7] "Fax from Robbins to F&W," Ex. G to the Hospital's Mot. for Summ. J., [Doc. 40-3] at p. 28.

[8] "Complaint Form," Ex. I to the Hospital's Mot. for Summ. J., [Doc. 40-3] at p. 33.

[9] "Finestone Warranty Request Form," Ex. J to the Hospital's Mot. for Summ. J., [Doc. 40-3] at p. 37.  The
Finestone Warranty Request Form was the document that advised the manufacturer that an EIFS installation was
completed, that the installation protocols were followed during construction, and that the manufacturer's product
warranty could be issued.

[10]The warranty provided, in full:

    FINESTONE warrants that the FINESTONE Architectural Wall System ("System": product or
    products and packaged components manufactured by FINESTONE and approved insulation
    boards) will perform satisfactorily under normal weather conditions for ten years from the date

3

January 14, 2003.  This Limited Warranty waived implied warranties of merchantability and for fitness for a particular use, and limited the buyer's remedies to either replacement of the applicable coatings component or refund of the original purchase price.[11]

### C. Remediation Efforts: First Pick and Clean (May 2003)

Robbins met with a Finestone representative on January 28, 2003 to discuss the rust issues with the EIFS.  The representative's solution was a "pick and clean," in which a contractor would pick out the iron particles of the exterior wall using a knife, and then clean the rust stains with a solution.  The Finestone representative then sent a follow up letter on February, 18, 2003, noting that the EIFS had exhibited "limited amounts of sand particles that cause[d] a slight color differential, and that Finestone would hire a contractor "at no cost to remove the affected

---

shown below. FINESTONE further warrants that the system will perform as a drainage-type application and  protect the underlying structure from damage due to incidental moisture intrusion when used with an approved weather barrier applied over approved substrates and  will remain fade, chip, flake and water-resistant for the warranty period so long as surface integrity is maintained. All Finish colors must be pre-approved in writing by FINESTONE.

Owner must notify FINESTONE in writing of any claim under this warranty within 30 days after discovery of the item that is the basis for the claim. FINESTONE's sole liability is expressly limited to either the replacement of the applicable FINESTONE coatings component or refund of the original purchase price.

This warranty is effective only when all components of FINESTONE Coatings are applied strictly in accordance with FINESTONE's written instructions on a substrate approved by FINESTONE. This warranty does not cover damage caused in whole or in part by acts of god, alterations, abuse, misuse, improper storage, lack of maintenance, winds in excess of gale force, sealants and adjacent materials, structural movement, workmanship or improper design or detailing conditions not defined in our product binder or reviewed by FINESTONE in writing.

FINESTONE shall not in any case by liable for special, incidental or consequential damages. The remaining warranty period may be transferred to a subsequent owner of the structure upon written notice to FINESTONE at the  address provided below. FINESTONE makes no other warranty on FINESTONE Coatings including any implied warranty of merchantability or fitness for a particular use.

"EIFS warranty," Ex. U to the Hospital's Reply Mem., [Doc. 50-1], at p. 77.

[11] *Id.*

particles."[12]  In May 2003, BASF hired a remediation contractor, Southern Stucco Coatings &

Paint, to perform the "pick and clean" procedure.  According to the Hospital, an internal

Finestone memo noted that the rust could reappear and that Finestone should reinspect the site

after six months, but Finestone did not conduct a follow-up inspection.[13]

### D. Remediation Efforts: Second Pick and Clean (2005-2006)

About a month after the first remediation effort (June 2003), the Hospital once again

noticed that the rust was reemerging, and they lodged another complaint with Finestone in

December 2004.  Finestone advised Robbins that it had recommended a second pick and clean

effort to take place in the second quarter of 2005.  Allegedly due to Hurricane Rita, Finestone

delayed the second pick and clean until May 2006.[14]  Before the May 2006 pick and clean

commenced, the Hospital contracted Robbins to remove and replace EIFS on the Utility building

at the facility that had been damaged by Rita.   In the course of performing work on the Utility

Building, Robbins unilaterally decided to remediate the rust stains present on the building.

While the Hospital alleges that Robbins performed the pick and clean procedure in accordance

with Finestone protocol, BASF asserts that Robbins performed the work incorrectly (not using

Finestone products), leading to "unique and distinct" rust stains on the Utility building.  BASF

has essentially disclaimed any responsibility for the Utility building in light of Robbins' work on

it.[15]

---

[12]"February 18, 2003 letter from Finestone," Ex. N to the Hospital's Mot. for Summ. J., [Doc. 40-3] at p. 68.

[13] "Internal Finestone Memo," Ex. O to the Hospital's Motion for Summ. J., [Doc. 40-3] at p. 79.

[14] The Hospital asserts that this does not make sense.  The second remediation was to take place in the second
quarter of 2005, which is April, May, and June.  Hurricane Rita struck the Lake Charles area in Septmeber 2005,
*after* the second quarter of 2005.  Thus, the Hospital notes that BASF has no valid explanation why the second
remediation effort was delayed.

[15] BASF relies on the following language in its EIFS warranty to disclaim responsibility:

### E.  Unsuccessful Meeting to Discuss Potential Third Pick and Clean (May 2008)

Finestone then had another contractor perform pick and clean remediation in May 2006 on the other two buildings at the facility (the Medical Office building and Hospital building). Following this second remediation, the Hospital once again noticed rust stains on the facility buildings and complained to Finestone.  A Finestone representative (Mr. Bowen) met with Pomarico, Hospital representatives, a Bessette representative, and a Robbins representative to discuss the rust problem in May of 2008.  Bowen once again recommended the pick and clean method.  Pomarico refused, arguing that the only effective way to address the rust was to remove and replace the EIFS.  The other Hospital parties agreed: the pick and clean appeared to be making things worse, not better.

### F.  Breakdown in Communication after Meeting (2008-2010)

After the May 2008 meeting, on or about June 2, 2008, Bowen transmitted a follow-up letter, memorializing in writing the offer to pick and clean the Hospital building and Medical Office building (but not the Utility building).[16]  Pomarico then sent a response letter to Finestone on August 5, 2008, requesting that Finestone to perform a limited, "sample" remediation procedure which the Hospital would then review to determine if a third pick and clean would be worth it (although he indicated in his deposition and in the letter that he thought it was very unlikely that the pick and clean would be a good long term solution).[17]  BASF alleges it never

---

This warranty is effective only when all components of FINESTONE Coatings are applied strictly in accordance with FINESTONE's written instructions on a substrate approved by FINESTONE. This warranty does not cover damage caused in whole or in part by acts of god, alterations, abuse, misuse, improper storage, lack of maintenance, winds in excess of gale force, sealants and adjacent materials, structural movement, workmanship or improper design or detailing conditions not defined in our product binder or reviewed by FINESTONE in writing.

[16] "June 2, 2008 letter to Pomarico," Ex. Q to the Hospital's Reply Mem., [Doc. 50-1] at pp. 53 –54.

[17] "August 5, 2008 letter to BASF," Ex. R to the Hospital's Reply Mem., [Doc. 50-1] at p. 56.

received this letter, and in the hearing, the parties noted that the person the letter was addressed to at Finestone no longer works there.  After this August 2008 letter, it appears that the parties ceased communicating altogether.

Because Finestone allegedly never received Pomarico's letter, it closed the Hospital's file on August 19, 2009.[18]  The next year, on April 29, 2010, the Hospital filed this lawsuit.

## MOTION FOR SUMMARY JUDGMENT STANDARD

A court should grant a motion for summary judgment when the pleadings, including the opposing party's affidavits, "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  The party moving for summary judgment is initially responsible for demonstrating the reasons justifying the motion for summary judgment by identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact for trial. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995).  The court must deny the moving party's motion for summary judgment if the movant fails to meet this burden. *Id.*

If the movant satisfies this burden, however, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id*. (quoting *Celotex*, 477 U.S. at 323).  In evaluating motions for summary judgment, the court must view all facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  There is no genuine issue for trial, and thus a grant of summary judgment is warranted, when the record as a whole "could not lead a rational finder of fact to find for the non-moving party…" *Id.*

---

[18] The Hospital asserts that the closing of the file was a "unilateral" action by BASF and without any notice to the Hospital.  Allegedly, at no point did BASF advise the Hospital that it would not undertake any further repair efforts or that it had abandoned its repair obligations.

## LAW AND ANALYSIS

### I.  The Hospital's Partial Motion for Summary Judgment

The Hospital makes two arguments in its motion: (1) that the remedy limitations and waivers of implied warranties in the Limited Warranty are unenforceable and (2) if the court finds that the Limited Warranty is enforceable, that ambiguity in the Limited Warranty should be construed in favor of the Hospital.

#### A.  Enforceability of Remedy Limitations and Waiver of Implied Warranties in EIFS Limited Warranty

In its motion, the Hospital offers a three-part argument on whether the Limited Warranty's limitations of remedies (limiting the Hospital to either refund of the purchase price or replacement of the product) and waiver of implied warranties are enforceable.[19]  This argument forms the bulk of its Partial Motion for Summary Judgment.

#### 1.  Waiver of implied warranties and limitation of warranties in the EIFS warranty under the *Prince* test

The Hospital argues that the waiver of implied warranties and limitation of remedies within the Limited Warranty are unenforceable because: (1) they were not written in clear and unambiguous terms; (2) they were not contained in the sales documents; (3) they were not brought to the attention of the buyer and explained to them.

Before addressing the three elements required to effectively waive warranties, BASF makes an overarching argument that the Hospital is incorrectly conflating waiver of implied warranties supplied as a matter of Louisiana law (under La. Civ. Code Ann. art. 2520 and 2524) versus express warranties provided in the written EIFS warranty. Since the prescription period

---

[19] *See* Finestone Warranty language, *supra* note 10.

for the implied warranty claims (one year) has allegedly expired, BASF accuses the Hospital of attempting to avoid the consequences of prescription by arguing that the express EIFS Limited Warranty, which has a term of ten years, somehow incorporates implied warranties by failing to effectively waive them, thus meaning that the implied warranty claims are viable for a ten year period.  Continuing, BASF notes that even if the Hospital is correct on this point, a breach of express warranty claim is still subject to a one year prescriptive period, regardless of the express warranty terms.

In its reply, the Hospital argues that BASF's argument on prescription of warranty claims is erroneous, for the reasons discussed *infra* in BASF's Motion for Summary Judgment.  Turning to the waiver of implied warranties issue, the Hospital asserts that it is BASF who has ignored Louisiana jurisprudence in making its argument, and that Louisiana law "unquestionably requires" waiver to be clear and unambiguous, contained in the sales document, and brought to the Hospital's attention in order to be effective.   Concluding, the Hospital asserts that while BASF correctly notes that this case involves implied warranty claims and express warranty claims, it erroneously accuses the Hospital of confusing the separate warranty obligations in an attempt to expand the terms of its written warranty.  The Hospital notes that BASF issued the Hospital a warranty which guaranteed the EIFS would have certain aesthetic properties; instead, the Hospital got a "rust-riddled finish coat."  As such, the Hospital alleges it is not trying to expand the terms of the warranty, but rather wishes to show that BASF's attempt to limit available damages, like its attempt to waive implied warranties, was ineffective.

The undersigned finds that BASF misconstrues the Hospital's argument in this section. The Hospital is simply stating that the waiver of implied remedies and the limitation of available remedies in the Limited Warranty were ineffective because BASF did not properly alert the

Hospital about these waivers and limitations.  It is not attempting to bootstrap the ten year warranty period onto implied warranty claims.

Turning to the relevant law, in 1973, the Louisiana Supreme Court, in *Prince v. Paretti Pontiac Co.*, 281 So.2d 112 (La.1973), established than if a seller/manufacturer wishes to waive implied warranties, this waiver must be: (1) written in clear and unambiguous terms; (2) contained in the sales documents; and (3) brought to the attention of the buyer or explained to him.  *Id.* at 117.  Courts have deferentially applied this rule to consumer-purchasers, conforming to the Louisiana Supreme Court's finding that "safeguards protecting consumers must be more stringent than those protecting businessmen in the marketplace." *Louisiana Nat'l Leasing Corp. v. ADF Serv., Inc.*, 377 So. 2d 92, 96 (La. 1979).  Accordingly, waivers of implied warranties are often found ineffective, as they do not meet all three requirements of the *Prince* test.  The seller/manufacturer has the burden of proving that the buyer waived the warranties. *Pias v. Wiggins*, (La. App. 3rd Cir.10/09/96), 688 So. 2d 1103, 1106.  Courts in Louisiana have also extended the three-part *Prince* test to warranty provisions which limit liability or recoverable damages. *Harvey v. Mosaic Fertilizer, LLC*, 2009 WL 3112144 (E. D. La. 2009); *Fontenot v. F. Hollier & Sons,* 478 So. 2d 1379 (La App. 3 Cir. 1985).  Based on Louisiana jurisprudence, both the waivers of implied warranties and the limitations on remedies in the EIFS warranty must meet the above three requirements.  Thus, the court will address each requirement in turn.

### a.  The warranty was written in clear and unambiguous terms

The Hospital first asserts that there are several terms in the EIFS Limited Warranty[20] that are ambiguous: (1) it is unclear whether the waiver of implied warranties also waives claims for breach of implied warranty against redhibitory defects; (2) it is unclear what the waiver of

---

[20] EIFS Limited Warranty, *supra* note 10.

"special, incidental, or consequential damages" means; and, (3) it is unclear whether "replacement" in the warranty means replacement of the EIFS wall or else simply delivering pails of new finish coat to the Hospital.

BASF counters that the implied warranty waivers are clear and unambiguous, and that the Hospital's assertion that terms like "replacement" are ambiguous is immaterial, as such terms are utilized in declaring the limited remedies under the express EIFS Limited Warranty, and not anything to do with the implied warranties. [21] Citing to the relevant portion of the warranty that disclaims implied warranties, BASF asserts that it is clear that this language waives implied warranties.[22]

The Hospital replies that Louisiana law requires warranty limitations to be unambiguous so that a contract party can make an informed decision prior to accepting waiver of warranties. Since the Hospital did not even have the warranty when the rust appeared, it argues that the warranty was even worse than ambiguous: it was non-existent.

The Fifth Circuit case, *Datamatic, Inc. v. International Business Machines Corp.*, 795 F.2d 458 (5th Cir. 1986), provides guidance on whether this Limited Warranty language is clear enough in regards to the consequential damages provision and the waiver of implied warranties provision. In *Datamatic,* a manufacturer (IBM) sold computers to several corporations, including in the contract of sale a clause that expressly limited its liability as follows:

---

[21]BASF erroneously assumes here that the requirements to waive implied warranties do not also apply to limitations of remedies.

[22] The relevant portion of the Limited Warranty provides:

> FINESTONE shall not in any case be liable for special, incidental, or consequential damages . . . FINESTONE makes no other warranty on FINESTONE coatings, including any implied warranty of merchantability or fitness for a particular use.

> IBM will not be liable for personal injury or property damages except personal injury or property damage caused by IBM's negligence. IBM shall in no event have obligations or liabilities for consequential damages.
>
> The foregoing Warranties and Limitations are exclusive remedies and are in lieu of all other warranties express or implied, including but not limited to the implied warranty of merchantability.

*Id.* at 460.  The Fifth Circuit acknowledged that Louisiana law permitted a seller to limit or exclude the implied warranty against redhibitory defects, but that to be effective, the limitation or exclusion had to follow the requirements of the *Prince* test: (1) in the sales contract, (2) clear and unambiguous, and (3) brought to the buyer's attention.  *Id.* at 464.  While the court noted that usually, warranty limitations were construed against manufacturers, in the *Datamatic* case, "the IBM sales were to commercially sophisticated parties," allowing the court to hold the buyer to "a higher standard than an unknowledgeable customer."  *Id.* at 465.  The Fifth Circuit found that under this higher standard, the language was clear and unambiguous enough to allow for exclusion of implied warranties against redhibitory defects, and that the "consequential" damages provision was similarly clear and unambiguous.  *See id.*

In this case, it cannot be said that a professional architect overseeing a large construction project would not be similarly considered a sophisticated party.  Accordingly, the court will apply a higher standard than it normally would in a typical consumer case to discern whether the implied warranty waivers and consequential damages provisions are clear and unambiguous.  Reading through the Limited Warranty, the waiver of implied warranties is similarly clear to the language in the *Datamatic* case: while it does not specifically mention waiver of implied warranties against redhibitory defects, it "makes no other warranty on FNESTONE COATINGS, including any implied warranty of merchantability or fitness for a particular use."  Additionally, while the Hospital asserts that the warranty language limiting "consequential" damages

("FINESTONE shall not in any case be liable for special, incidental, or consequential damages") is too ambiguous to be enforceable, this language is also similar to the broad "consequential" damages language in the *Datamatic* case. The undersigned thus finds that these terms are both clear and unambiguous.

The clarity of the limitation on remedies (either replacement of the finish coat or refund of the purchase price) is more contentious.[23] The Hospital argues that this limitation of remedies was ambiguous and unclear because "replacement" could mean replacement of the entire EIFS system *or* replacement of the defective finish coat only. It asserts that this was particularly important because replacement of only the finish coat would be worthless remedy, since the finish coat could not be removed and replaced without destroying the rest of the EIFS system. BASF counters that the Hospital's dissatisfaction with this limited remedy does not render the limited remedy unenforceable, and that any issues with the sufficiency of the warranty were due to the negligence of Pomarico, who approved this Limited Warranty language by reviewing and signing off on the EIFS "submittals" from Robbins. It argues that, viewing the Limited Warranty as a whole, it is clear that the "limited" remedy of replacement of the coatings component or refund of the purchase price can only refer to the EIFS finish coat itself, and not the entire EIFS system. Further, it argues that because it was only responsible for the sale of the EIFS, and not the installation of the EIFS, it would not make sense for the Limited Warranty supplied by BASF to offer to strip and reclad the facility with replacement EIFS.

---

[23] The relevant portion of the Limited Warranty provides:

> FINESTONE's sole liability is expressly limited to either the replacement of the applicable FINESTONE coatings component or refund of the original purchase price.

The applicable warranty language is as follows: "FINESTONE's sole liability is expressly limited to either the replacement of the applicable FINESTONE coatings component or refund of the original purchase price." Thus, the inquiry becomes, what exactly constitutes the "applicable coatings component"? Louisiana's Civil Code provides that "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. Civ. Code Ann. art. 2050. The Limited Warranty begins with this statement: "FINESTONE warrants that the FINESTONE Architectural Wall System ("System": product or products and packaged components manufactured by FINESTONE and approved insulation boards) will perform satisfactorily under normal weather conditions for ten years from the date shown below." Thus, the warranty differentiates between the entire EIFS "System" and the various "components" which make up the "System." The "coatings component" would thus be a part of the group of "components" that make up the "System." While this language leads to an unfortunate result for the Hospital, in that replacement of the one defective "component" part would potentially not remedy the ultimate problem, the undersigned cannot say that, when reading the contract as a whole, replacement of the "applicable coatings component" is so ambiguous and unclear to render the provision unenforceable under *Prince*. Accordingly, the undersigned will turn to the second and third requirements of the *Prince* test.

> **b. Despite the fact that the Hospital, through Pomarico, had some notice of BASF's intent to limit remedies and waive implied warranties, there is no evidence that the waivers and limitations were brought to Pomarico's attention and explained to him**

The Hospital next contends that because the Limited Warranty was not contained in the sales document or contract (since the Limited Warranty was issued after the EIFS was installed), the Limited Warranty limitations and waivers cannot be controlling on the parties.

14

Additionally, the Hospital asserts that the warranty waivers and limitations are not controlling because, at no point did Finestone bring the warranty to the Hospital's attention, nor explain the warranty limitations or waivers at any time before the rust appeared.

BASF counters that the implied warranty waivers and were provided to, and approved by, Bessette and the architect, Pomarico in 2001, in connection with (and prior to) their approval of the EIFS product for the facility, via the submittals they reviewed.  It argues that Pomarico not only saw very similar warranty language in the submittals, he also "signed off" on these submittals by initialing them.  It also notes that the Hospital did not buy the EIFS product directly from Finestone, and thus it is disingenuous to assert that the implied warranties are waived because they were not included in an act of sale.  Instead, the submittals were approved by Pomarico (which BASF argues put the Hospital on notice of the implied warranty waivers, since he was acting on behalf of the Hospital as its agent) and Bessette, and following approval, the EIFS was purchased by the subcontractor (Robbins) and installed onto the facility buildings.  BASF also argues that the Hospital's argument that the implied warranty waivers were not brought to its attention also fails: Pomarico had notice of the waivers of implied warranties, which were stated in all caps in the submittal documents.

The Hospital replies by reasserting that BASF has offered no evidence of sales documents or a contract which set forth or incorporated the written Limited Warranty.  It acknowledges that while it was Finestone's "right" to issue the warranty after installation of the EIFS, this does not excuse Finestone from alerting the Hospital of the waiver of implied warranties.  The Hospital also rejects BASF's argument that the implied warranty waivers were supplied to the Hospital in submittals to Bessette and Pomarico, which contain somewhat similar warranty language.  Instead, the only thing that matters is whether the waivers appear in the sales

contract.  Preliminary documents submitted beforehand do not count.  It argues that even if the submittals are considered sufficient notice documents for the waiver of implied warranties, they are too vague and ambiguous to show disclosure of warranty limitations.  Additionally, it notes that several of the terms in the final EIFS Limited Warranty are nowhere to be found in the submittal documents.

In support of its argument that the submittals put the parties on sufficient notice that implied warranties would be waived and remedies would be limited, BASF cites to the Western District of Louisiana case, *Hollybrook Cottonseed Processing, LLC v. Carver, Inc.*, no. 09-0750, 2010 WL 1416781 (W.D. La., April 1, 2010).  BASF makes the general assertion that, when sophisticated parties are involved, waivers are enforceable as long as they are clear and unambiguous and the party has notice of them.  Turning to *Hollybrook* case, however, the court construed Pennsylvania law, not Louisiana law, to ascertain whether the limitation of liability provisions in the contract were binding on the parties.  *See id.* at *5.  Further, the additional cases BASF cites for the proposition that sophisticated parties are held to a higher standard in instances where the other party tries to limit or waive remedies only addressed whether waiver terms in a limited warranty were ambiguous.  *See Datamatic*, 613 F.Supp. at 720; *Orthopedic & Sports Injury Clinic v. Wang Laboratories, Inc.*, 922 F.2d 220, 226 (5th Cir. 1991).  Indeed, in *Datamatic*, the limited warranty language actually appeared in the sales contract, and the buyer signed the sales contract.  *Datamatic*, 613 F. Supp. at 720 – 21.

In contrast, the Hospital cites heavily to the Louisiana Third Circuit case, *Dixie Roofing Co. of Pineville, Inc. v. Allen Parish Sch. Bd.*, 95-1526, 95-1527, (La. App. 3 Cir. 5/8/96); 690 So. 2d 49, to support its argument that waivers of implied warranties are ineffective if they are issued after the completion of construction and discovery of the defect and are not contained in

16

the initial sales contract.   In *Dixie Roofing*, a school contracted to have its roof removed and

replaced. *Dixie,* 690 So. 2d at 51 – 52.  Part of the materials used to replace the roof consisted of

a single ply rubber membrane, manufactured by Firestone. *Id.* at 52.  The roofing contract

referred to Firestone's warranty, which required approval by Firestone on completion of the roof

installation before it would be issued. *Id.*  Before construction was complete and the warranty

was issued, the school experienced heavy rainstorms, which caused the Firestone-manufactured

rubber membrane to shrink, leading to severe leaking and damage to the school's interior. *Id.*

Firestone alleged that it could not be subject to a redhibitory action, in part because the Firestone

warranty, issued after construction was completed, precluded liability for redhibitory defects. *Id.*

The court rejected this argument, finding that:

> [t]he record shows Firestone's warranty was not incorporated in the original
> contract between [the roofing contractor] and the School Board. Firestone
> acknowledges in brief the warranty issuance required completion of the
> construction and approval by it. A valid waiver of warranty requires all of the
> following: (1) it must be written in clear and unambiguous terms; (2) it must be
> contained in the sales document; and (3) it must be brought to the attention of the
> buyer or explained to him. *Matthis v. Couvillion,* 613 So.2d 1024, 1025 (La.App.
> 3 Cir.1993); *Thibodeaux v. Meaux's Auto Sales, Inc.,* 364 So.2d 1370, 1371
> (La.App. 3 Cir. 1978). Therefore, under Louisiana law the warranty does not limit
> the School Board's right to seek damages.

*Id.* at 53.

In this case, unlike in *Dixie Roofing*, in which the warranty and its limitations did not

surface until after installation of the roof, there is at least *some* evidence that the Hospital had

notice of the warranty waivers and limitations before the final warranty was issued.  The issue in

this case seems to be whether the warranty language in the submittals, transmitted to Bessette

and Pomarico in 2001, put the Hospital on sufficient notice that implied warranties would be

waived and the express remedies would be limited.

17

The Hospital cites to several different cases for the proposition that submittals that are not a part of the sales contract are ineffective to eliminate the requirement that waivers and limitations be in the sales contract.  Most helpful to the court's inquiry is the Fifth Circuit case, *Gulf South Mach., Inc. v. Kearney & Trecker Corp.*, 756 F.2d 377 (5th Cir. 1985), in which a machine shop that made metal components for the oil industry ("GSM") bought a computerized machine designed for machining of metal components from a manufacturer ("K&T"). *Id.* a 378. Upon receipt of GSM's purchase order for the machine, K&T sent an acknowledgement form to GSM.  *Id.* at 379.  The front of the form contained a statement that it was an acceptance only upon the terms and conditions listed on the reverse side, and the reverse side contained a disclaimer of all implied warranties.  *Id.*  GSM filed the acknowledgement with their purchase order, but apparently was not made aware of the warranty clause at that time.  *Id.*  Unfortunately for GSM, upon receipt and installation of the machine, it immediately began to malfunction.  *Id.* After several unsuccessful repair attempts by K&T, GSM asked for a replacement machine, but K&T refused.  *Id.*  GSM then sued for recission of the sale, reduction of the purchase price, and damages because of the redhibitory defects.  *Id.*  At trial, the jury issued a verdict in favor of GSM.  *Id.*

On appeal, K&T argued that the disclaimer of warranties against redhibitory defects, written on the back of the acknowledgement form, was binding on the parties.  *Id.* at 379.  GSM countered that the waiver was not a term of the contract because the form was extraneous to the contract of sale.  *Id.* at 380.  The Fifth Circuit sided with GSM, finding that the disclaimer of implied warranty against redhibitory defects was not binding on the parties, in part because it was very difficult for waivers that were not present in the contract of sale to be binding on the parties in light of the *Prince* line of cases:

Since the Louisiana Supreme Court decision in *Prince* in 1973, there have been only four reported cases in which the waiver has been found to be effective: *Louisiana Nat. Leasing Corp. v. ADF Serv.,* 377 So.2d 92 (La.1979); *Capital City Leasing Corp. v. Hill,* 394 So.2d 1264 (La.App.1981); *FMC Corp. v. Continental Grain Co.,* 355 So.2d 953 (La.App.1977); *Anderson v. Bohn Ford, Inc.,* 291 So.2d 786 (La.App.1973). In each case, the document containing the waiver was signed by the buyer, and in two of the cases, the agreement was examined by lawyers prior to execution. In each case, the court emphasized the signature and/or the examination by legal counsel before signing. In four other cases, the Louisiana courts have refused to find that the third prong of the test was met despite the fact that the business buyer signed the waiver. *Linch Intern. Trucks, Inc. v. Pierre,* 434 So.2d 1225 (La.App.1983); *Tuttle v. Lowrey Chevrolet, Inc.,* 424 So.2d 1258 (La.App.1982); *Equilease Corporation v. Hill,* 290 So.2d 423 (La.App.1974); *Harris v. Automatic Enterprises of Louisiana, Inc.,* 145 So.2d 335 (La.App.1962). The jury's finding that the waiver clause was not brought to the specific attention of GSM and that GSM did not waive the implied warranty of redhibition is in lock-step with Louisiana law.

*Id.* at 381. The Fifth Circuit also found that, even though "that the safeguards which protect non-business consumers are more stringent than those protecting businessmen, a waiver of the warranty against redhibitory defects is nevertheless scrutinized very carefully to make sure that the third prong of the [*Prince*] test is satisfied even where the buyer is a businessman [like GSM]." *Id.* at 380 – 81.

In this case, it is difficult to apply the second prong of the *Prince* test to the facts of this case, because there does not appear to be an original "contract of sale." In the absence of an original contract of sale, the court must essentially jettison the second prong of the *Prince* test as inapplicable to the case at hand. Thus, the inquiry must ultimately turn on whether the relevant warranty provisions were brought to Pomarico's attention and explained to him (the third prong of the *Prince* test). This inquiry also provides unique problems which show that this case is distinguishable from most cases construing *Prince*. Unlike in many of the cases which follow *Prince*, this case deals with parties that are arguably more sophisticated than the average consumer. Additionally, while the Hospital, through Pomarico, had at least *some* notice of what

19

the final Limited Warranty might look like, it is uncertain whether Pomarico knew that the terms in the submittals would definitely be the terms contained in the final Limited Warranty.

As noted by BASF, in its bid to become a subcontractor, Robbins submitted EIFS submittals to Pomarico and Bessette.  Pomarico reviewed and then signed off on these submittals by initialing them.  His one requirement was that the EIFS contain a ten year warranty, although at this point in the process, it does not appear that he required any other specifics on what the warranty might contain.

Turning to the substance of the submittals, they appear to show the various components of the EIFS system: the adhesive base coat, the finish coat, the waterproof membrane, etc.[24]  The submittals also explain how the various components of the EIFS system are assembled together to create the final product.[25]  The first submittal page that mentions warranties is on a page titled "Warranties: Drainage Systems."  The warranty language on the "Drainage Systems" appears in small print at the bottom of the page and is as follows:

> Limited Warranty
>
> Simplex Products Division[26] warrants that FINESTONE Coatings will perform satisfactorily under normal weather conditions for five years, or as noted above, from the date of original installation.  Buyer must notify Simplex in writing of any breach of warranty within seven days of discovery of breach.  Simplex's sole liability, and the Buyer's exclusive remedy, is expressly limited, as Simplex's option, to either replacement of nonconforming coatings with conforming coatings or repayment of the purchase price, less depreciation.
>
> This written warranty is effective only when all components of FINESTONE coatings are applied in accordance with Simplex's written instructions on a substrate approved by Simplex.  This warranty does not cover damages caused by abuse, misuse, improper workmanship, or improper installation.

---

[24] See "Submittals," Ex. 10 to BASF's Resp. to Partial Mot. for Summ. J., [Doc. 45-1], at pp. 135 – 148.

[25] See generally id.

[26] To clarify, BASF explained in its briefs that Simplex was, similar to Finestone, a predecessor-manufacturer. Thus, BASF/Finestone may be submitted for Simplex in this warranty language.

SIMPLEX SHALL NOT IN ANY CASE BE LIABLE FOR SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES. SIMPLEX MAKES NO OTHER WARRANTY ON FINESTONE COATINGS, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTIBILITY OR FITNESS FOR A PARTICULAR USE.[27]

Unlike in the ultimate Limited Warranty that issued, however, the warranty language in the submittals provided for a five year warranty period (as opposed to ten year warranty period) and required the buyer to notify the seller within seven days of a breach of warranty (as opposed to thirty days). Further, unlike in the Limited Warranty, this "Drainage System" warranty says nothing about whether the EIFS will remain "fade, chip, flake and water-resistant for the warranty period." Like in the EIFS Limited Warranty, however, the "Drainage System" warranty limits remedies to replacement of the product or repayment of the purchase price.[28] Additionally, like in the EIFS Limited Warranty, in the "Drainage System" warranty, the warrantor waives implied warranties of merchantability and fitness for a particular use.[29]

---

[27] *Id.* at p. 142.

[28] [Doc. 45-1] at p. 142.

The relevant portion of the EIFS Limited Warranty is as follows:

> Owner must notify FINESTONE in writing of any claim under this warranty within 30 days after discovery of the item that is the basis for the claim. FINESTONE's sole liability is expressly limited to either the replacement of the applicable FINESTONE coatings component or refund of the original purchase price.

[29][Doc. 45-1] at p. 142.

The relevant portion of the EIFS Limited Warranty is as follows:

> FINESTONE shall not in any case by liable for special, incidental or consequential damages. The remaining warranty period may be transferred to a subsequent owner of the structure upon written notice to FINESTONE at the address provided below. FINESTONE makes no other warranty on FINESTONE. Coatings including any implied warranty of merchantability or fitness for a particular use.

The submittals also contain a "10 Year Limited Warranty" for a product called Dens-Glass (which, as explained by BASF, is another component part of the EIFS system), although this warranty language is markedly different from the language in the final Limited Warranty.  In the Dens-Glass warranty, it limits remedies to reimbursement for the cost of repair or replacement of the affected Dens-Glass sheathing panels, up to a maximum amount of two times the original purchase price.[30]  It also limits (but does not waive) implied warranties for a particular purpose and implied warranties of merchantability to the duration period contained in the warranty, or ten years.[31]

Ultimately, even construing the evidence in the light most favorable to BASF, the undersigned cannot find that these submittals put the Hospital on sufficient notice that implied warranties would be waived and remedies would be limited.  As in the *Gulf South* case, even though the Hospital is a more sophisticated party than the average consumer, the third prong of the *Prince* test must be scrutinized very closely to ascertain whether Finestone brought these limitations to Pomarico's attention and explained them.  While Pomarico signed off on the submittal documents as a part of Robbins' bid process, there is no evidence that Pomarico knew that the warranty language in the submittals would be ultimately binding on the Hospital – all he knew at that point is that he had requested a "ten year warranty," which would issue later.

Further, while there is some submittal language that does similarly exclude implied warranties and limit remedies, it appears on a page that is *not* entitled something to the effect of "Warranties:  EIFS System," but rather is entitled "Warranties: Drainage Systems."  Was Pomarico expected to know that this page, and the warranties contained therein, applied to the

---

[30] *Id.* at p. 141.

[31] *Id.*

entire EIFS system, including the Finestone finish coat, absent an explanation from Finestone?

Additionally, as noted *supra*, other language on the "Warranties: Drainage Systems" page is

different from the ultimate Limited Warranty issued to the Hospital.  Was Pomarico expected to

know that the selective language limiting remedies and excluding implied warranties would

reappear in the Limited Warranty, but that he should not expect the other terms (for example, the

language on the "Drainage System" page requiring the buyer to give notice within seven days of

a breach of warranty, as opposed to the buyer giving thirty days notice of a breach of warranty,

as per the Limited Warranty) to appear in the Limited Warranty, absent an explanation from

Finestone?  Further, there is no explanation for why, instead, it would be unreasonable for

Pomarico to expect that the remedies provided in the final Limited Warranty would instead be

similar to those in the Dens-Glass portion of the submittals: namely, that the remedies would

instead be limited to replacement or repayment of up to two times the purchase price, and that

implied warranties would not be excluded, but instead would be limited in duration.  Once again,

Finestone never explained exactly what language in the submittals would ultimately be binding

on the Hospital in the Limited Warranty.  These discrepancies advise against a finding that the

exclusions of implied warranties and limitations of remedies within the Limited Warranty, issued

after discovery of the defect, are enforceable.

### 2.  "Meeting of the minds" on waivers and limitations

The Hospital also asserts that, because the EIFS Limited Warranty was issued after the

EIFS was sold and installed at the facility and the Hospital had reported the rust on the EIFS, it is

apparent that the Hospital did not freely consent to the limitations and waivers contained in the

warranty.  As such, the Hospital alleges that BASF cannot retroactively limit or disclaim liability

when it already knew of the complained-of defect.

23

BASF does not specifically refute this "meeting of the minds" argument, although it appears that BASF's arguments that the submittals were sufficient notice of what the Limited Warranty would contain could also apply to this argument.

The Hospital cites to *Bieber-Guillory v. Aswell*, 98-559 (La. App. 3 Cir. 12/30/98); 723 So. 2d 1145, to support the general contention that "[w]hen there is no meeting of the minds between the parties, there is no enforceable contract." *Id.* at 1149 – 50. In *Bieber-Guillory*, an interior designer sued her customers after they failed to pay her for design services. The trial judge ruled in favor of the interior designer. *Id.* at 1148. On appeal, the Third Circuit agreed with the trial court that the interior designer was owed a debt, but that because the designer never reached an agreement on her fees and merchandise before she rendered her services (instead, the customers only received a bill after she had finished decorating), this lack of consent between the parties prevented the court from finding that an enforceable contract ever existed. *Id.* at 1150.

This issue goes back to whether and to what extent Pomarico understood that the language in the submittals would eventually resurface in the final Limited Warranty. The undersigned cannot say, based on the evidence before the court, that Pomarico consented to the exclusion of warranties and limitation of remedies. As noted *supra*, the submittals contain two different warranties (on the "Drainage System" page and the "Dens-Glass") page, with one excluding implied warranties and limiting remedies to a refund of the purchase price or replacement of the component product, and the other limiting implied warranties in duration and limiting remedies to a redund of two times the purchase price or replacement of the product. While Pomarico signed off on these submittals, the undersigned cannot find that, based on these submittals alone, Pomarico tacitly approved of the limitations on remedies and exclusions of implied warranties found in the final Limited Warranty.

### 3. Waiver of warranty limitations through Finestone's conduct in agreeing to remediate

The Hospital further alleges that even after the warranty issued, Finestone did not communicate the warranty limitations (either refund of purchase price or replacement of EIFS), instead opting to offer remedial pick and clean procedures to fix the rust stains. Because Finestone never asserted the warranty limitations until the filing of this lawsuit, the Hospital asserts that BASF cannot now hold the Hospital to those limitations. It also argues that BASF has effectively waived any right to claim that the warranty limitations are applicable, since, through its behavior, it clearly offered remedies that were not in the warranty for years (pick and clean), not asserting the warranty limitations until this case was filed.

BASF does not spend much time addressing these arguments, aside from arguing that the case law the Hospital cited is too different to be persuasive in this case. BASF essentially asserts that it did not waive any terms of the express warranty simply because, as "a gesture of goodwill," it offered the pick and clean remediation procedure to remedy the rust problem. When the Hospital finally grew weary of the pick and clean procedure and BASF's "goodwill," therefore, this was the first time that BASF could bring up the issue of options under the Limited Warranty. BASF offers that, in this instance, it will refund the purchase price of the Finestone EIFS finish coat, as per the dictates of the Limited Warranty.

The Hospital replies that, notwithstanding BASF's "goodwill" arguments, it is clear from the record that the rust issue was reported to Robbins as early as December 17, 2002; a complaint initiation form was submitted on December 30, 2002; and that Finestone knew, based on this information, that the finish coat was contaminated. It asserts that it only cost Finestone $12,300 to do the two pick and clean jobs (essentially, half of the cost of supplying a new finish coat), and thus Finestone was motivated by money, not goodwill, in offering the pick and clean option.

In this portion of its motion, the Hospital cites the unpublished Louisiana Second Circuit

case, *Sabbath v. Martin*, no. 44,862, (La. App. 2 Cir. 10/28/09); 2009 WL 3449096.  In *Sabbath*,

the plaintiff bought a car from a used car dealership.  At the time she bought the car, the Contract

of Sale included a waiver of the warranty against redhibitory defects.  Apparently there were

issues with the car, because for the first three months that the customer possessed the car, she

brought it in every other week to the dealership for repairs.  At first, the dealership repaired the

car for free, despite the waiver of implied warranties found in the Contract of Sale.  Eventually,

however, the dealership presented the plaintiff with a repair bill totaling $1,736.13 and requested

one-half of the amount in cash for return of the car.  The court found that the waiver of warranty

against redhibitory defects in the Contract of Sale was unenforceable in part because the car

dealership's behavior was confusing and inconsistent with the terms of the warranty:

> [T]he vehicle was returned to [the dealership] for certain repairs after the sale and
> . . . those repairs were made without charge to [the plaintiff]. Those risks with the
> vehicle would be [the plaintiff's] responsibility in the absence of any warranty
> regarding the sale. Nevertheless, [the car dealership] repaired the vehicle as
> though a warranty existed. Additionally, [the car dealership's] failure to assert the
> waiver of warranty for those initial repairs led to the misunderstanding and
> dispute concerning the more extensive repairs that occurred in July 2008.

Like in *Sabbath*, Finestone's behavior was inconsistent with the written terms of the

Limited Warranty.  As noted *supra*, the EIFS Limited Warranty waives all implied warranties

and sets forth the two limited remedies (return of purchase price or replacement of the coating

component) as the sole remedies available to the Hospital.  Despite these express terms in the

warranty, Finestone continued to remediate again and again.  There is no explanation why, when

the parties met in May 2008 and the Hospital indicated that the pick and clean remediation

process was not working, Finestone did not assert at that time that perhaps a refund of the

purchase price or replacement of the product would be the better solution – instead, it once again offered the pick and clean process.

This is further complicated by the fact that the offered pick and clean remediation *added* to the problem by picking holes into the EIFS wall. Relegating the Hospital to the remedies contained in the Limited Warranty leads to the absurd result that even though Finestone made the problem with the finish coat worse by picking apart the surface of the EIFS, it should only be on the hook for the original purchase price of the finish coat. These arguments are unpersuasive to the court, and thus BASF's liability cannot simply be limited to the purchase price of the finish coat, as BASF requests.

### B. Construing Ambiguity in Written Warranty

Finally, the Hospital argues that even if the court finds the warranty limitations were not waived or made ineffective, the ambiguity of those provisions is construed in favor of the Hospital. As such, instead of BASF offering up its interpretation of a "replacement" of the product (pails of new finish coat), BASF should be required to replace the EIFS on the facility and throw in free labor and materials in order to do so. Because the court has found that the Hospital is not bound by the limited remedies within the Limited Warranty, however, its arguments in this section are moot.

### II. BASF's Motion for Summary Judgment

As the court has found that the waiver of implied warranties and limitation of remedies was ineffective, the court will next turn to the arguments in BASF's motion: (1) whether the Hospital has a valid claim for breach of implied warranty against redhibitory defects under La. Civ. Code Ann. art. 2520; (2) whether the prescriptive period on the Hospital's redhibition claim has expired; (3) whether the Hospital has a valid claim for breach of implied warranty that the

product is fit for ordinary use under La. Civ. Code. Ann. art. 2524; (4) whether the Hospital

waived its claims under the warranty by failing to report the rust within thirty days; (5) whether

BASF is liable for the Utility building, on which Robbins performed remediation work; and, (6)

whether BASF is entitled to choose between the two options in the written EIFS Limited

Warranty (either refund of purchase price or replacement of EIFS top coat).

### A.   Redhibition Claim

#### 1.   Redhibition does not require a direct buyer/seller relationship

BASF attacks Hospital's redhibition claim, arguing that under La. Civ. Code Ann. Art.

2520, the Hospital cannot prove the requisite buyer/seller relationship needed for a redhibition

claim. Allegedly, because the EIFS was incorporated into the final product (the facility) via a

construction contract before the Hospital took control of the facility, there was no sale of the

EIFS from Finestone to the Hospital, and thus it follows that there was no buyer/seller

relationship. BASF also cites heavily in this portion of its motion to the Louisiana Fourth Circuit

case, *K.E. Pittman v. Kaiser Aluminum Chemical Corp.,* 559 So. 2d 879 (La. App. 4 Cir. 1990)

to support its argument that if a product (like EIFS) is incorporated into a building during

construction, but before ownership of the building is transferred, a plaintiff cannot pursue a

redhibition claim against the manufacturer of that component part.

The Hospital counters that a party can assert a direct cause of action in redhibition against

both the seller of the product and the manufacturer. The Hospital then notes that the "component

part" argument by noting that the case that BASF relies on (*Pittman*) to make its argument has

not been accepted by other courts.

BASF replies that the clear language of art. 2520 limits redhibition actions to those

between a buyer and a seller, and that in the cases cited by the Hospital in which a manufacturer

was liable under a redhibition theory, there was a "nexus" between the plaintiff and the defendant-manufacturer lacking in this case; namely, that those plaintiffs had contracted themselves for the installation of the product at issue and/or specified the particular product for use. In this case, instead, the Hospital contracted for construction and delivery of a completed building and delegated to its architect, Pomarico, and its contractors, Bessette and Robbins, the full responsibility for selecting products such as EIFS.

Article 2520 does indeed provide that "[t]he *seller* warrants the *buyer* against redhibitory defects, or vices, in the thing sold. " La. Civ. Code Ann. art. 2520 (emphasis added). The question thus becomes whether courts construing this article read this provision to be very narrow such that it only includes direct buyer/seller relationships. The court finds that it has not.

Turning to the cases that BASF cited to support its argument that redhibition requires a buyer/seller relationship, many of the cases that BASF cites do not shed any light on the rights of a buyer who purchases a product through a subcontractor or contractor middleman.[32] Additionally, the cases BASF cites for the proposition that a redhibition claim requires vendor/vendee relationship additionally do not seem to provide guidance on whether a consumer has a valid redhibition claim against a manufacturer.[33]

The Hospital has cited several cases that support the argument that a buyer may pursue a redhibition claim against a manufacturer. For example, in *Moreno's, Inc. v. Lake Charles*

---

[32] In *Franks v. Royal Oldsmobile Co., Inc.*, 605 So. 2d 633 (La. Ct. App. 1992), the court held that a plaintiff did not have a viable cause of action against a car dealership under at. 2520 because the vehicle was purchased by a corporation that the plaintiff owned an interest in, and not the plaintiff himself. *Id.* at 635. The next two cases, *Stack v. Irwin*, 246 La. 777, 167 So.2d 363 (La. 1964) and *Alvis v. CIT Group/Equipment Fin., Inc.*, (La. App. 3 Cir. 2005), 918 So.2d 1177, appear to address situations where a valid art. 2520 claim was not present because there was no completed sale: in *Stack*, the court addressed a contract to sell, and in *Alvis*, the court addressed a lease.

[33] *See Hostetler v. W. Gray and Company, Inc.*, 523 So. 2d 1359 (La. App. 2 Cir. 1988), writ den., 531 So.2d 470 (La. 1988) (no redhibition claim against a surveyor); *Josephs v. Austin*, 420 So. 2d 1181 (La. App. 5 Cir. 1982), writ den., 427 So.2d 870 (La. 1983) (no redhibition claim against real estate broker); *Davis v. Davis*, 353 So. 2d 1060 (La. App. 2 Cir. 1977), writ den., 355 So.2d 549 (La. 1978) (no redhibition claim against realtor); and *LeBlanc v. Ellerbee Builders*, Inc., 317 So.2d 1 (La. App.1 Cir. 1975) (no redhibition claim against a contractor).

*Catholic High Sch., Inc.*, 315 So. 2d 660 (La. 1975), a subcontractor filed a suit against a building owner for costs of replacing an air conditioner compressor, and the owner then filed a third party cause of action against the compressor's manufacturer. *Id.* at 661.  The Louisiana Supreme Court held that the third-party plaintiff (building owner) had a viable direct right of action against the manufacturer under the seller's (contractor) accessory right of action, as the seller had proven a redhibitory defect. *Id.* at 663.  Additionally, in *Aucoin v. S. Quality Homes, LLC*, 2007-1014 (La. 2/26/08), 984 So. 2d 685, the Louisiana Supreme Court held that a buyer may pursue a redhibition cause of action against a manufacturer when the manufacturer is directly liable for defects resulting from the original manufacture of the defect. *Id.* at 693.

In this instance, it is clear that the Hospital may pursue a direct cause of action under art. 2520 against the manufacturer, BASF.  While BASF focuses on the specific buyer/seller language in art. 2520 for its argument that the Hospital is not a proper party, it ignores case law that has established that a manufacturer may be directly liable to a building owner for redhibitory defects, even if a third party middleman actually purchased the products.  Further, BASF's argument that the Hospital did not specifically contract to buy the EIFS (and thus there is no "nexus" between the Hospital and BASF to allow for a redhibition claim) does not hold water.  While the Hospital delegated the selection and purchase of EIFS and other building materials to its architect and its contractors, these actors acted as agents for the Hospital.  Not permitting redhibition claims just because a building owner delegates the purchases of certain products to third party agents would prevent building owners from ever pursuing redhibition claims against manufacturers in construction cases.  BASF's reading of art. 2520 is thus too limited to be persuasive.

Further, as pointed out by the Hospital, the "component part" argument BASF cites from the case *Pittman v. Kaiser Aluminum*, 559 So.2d 879 (La. App. 4 Cir. 1990) has been rejected by other courts.  In *Pittman*, the plaintiff sued the manufacturer of certain wiring components installed in his new home after it was destroyed by fire, alleging that faulty wiring led to the disaster. *Id.* at 1182.  The Court of Appeals upheld the exception of no cause of action, finding no vendor/vendee relationship existed between the building owner and the component part manufacturers. *Id.* at 1183.  In both the Eastern District of Louisiana and the Western District of Louisiana, however, courts have rejected the *Pittman* argument that a component part manufacturer cannot be liable in a redhibition cause of action because of lack of vendor/vendee relationship. *See Howard Pardue v. Cummins, Inc.*, no. 08–1677, 2009 WL 5171462 (E.D. La. Dec. 17, 2009) ("Given that the Louisiana Supreme Court has never precluded a cause of action in redhibition against a component part manufacturer, and to the contrary has interpreted the statute liberally, this Court finds that [the plaintiff] does state a claim against Defendants in redhibition"); *accord, Ritt Truck Repair, LLC*, no. 09–1105,2011 WL 865582 (W.D. La. March 10, 2011).  BASF's argument that it can escape a redhibition claim because it only manufactured a defective component part thus similarly fails.

### 2.  The rust on the EIFS was a redhibitory hidden defect

BASF also argues that the Hospital's redhibition claim fails because it has failed to establish the required element of a "hidden defect" under La Civ. Code Ann. art. 2521.  BASF argues in this portion of its motion that because the rust stains were visible prior to substantial completion of the facility, and prior to the Hospital acquiring ownership of the buildings, the Hospital had clear knowledge of the non-hidden rust defect before it ever acquired ownership of the EIFS as a component part of the facility.

31

The Hospital counters that it is undisputed that iron pyrite particles are impossible to detect and remove from the finish coat until they start to rust, and that this did not happen until the EIFS was installed and the particles began to rust from exposure to the elements.  Next, the Hospital argues that BASF's argument that the Hospital knew about the rust before transfer of ownership from Bessstte to the Hospital is also misplaced: instead, the Hospital has always owned the facility, and ownership never "transferred" from Bessette to the Hospital. Additionally, it argues that BASF misunderstands the "time of sale" language from art. 2521 and ignores the fact that the rust originally appeared after the EIFS components were installed on the facility walls.  For the Hospital, the relevant transaction for the purposes of art. 2521 was therefore not the date of substantial completion of the facility or the date that the Hospital took possession of the completed facility, but rather the date when Finestone put the EIFS into commerce through its distributor, F&W.

The relevant provision of the Louisiana Civil Code that BASF relies on for this portion of its argument is as follows: "[t]he seller owes no warranty for defects in the thing that were *known to the buyer at the time of the sale*, or for defects that should have been discovered by a reasonably prudent buyer of such things."  La. Civ. Code Ann. art. 2521 (emphasis added). BASF cites a few cases to support its argument that when a defect is apparent at the time of sale, it cannot be a redhibitory defect.  Turning to these cases, however, it is apparent that they are distinguishable from the one here.[34]

---

[34] *See Mangerchine v. Reaves*, 2010-1052 (La. App. 1 Cir. 3/25/11); 63 So. 3d 1049, 1062, reh'g denied (Apr. 28, 2011) (plaintiff had valid redhibition claim because defects were not "*manifest* or evident to them at that time [of sale]."); *Nicholson v. Ellerbe*, 434 So. 2d 1146, 1148 (La. Ct. App. 1983) (plaintiff did not have viable redhibition claim because the defect was "discoverable by simple inspection, it was even known to the buyer and acknowledged by the seller before the property was purchased.").

In its reply, the Hospital cites one case, *Theriot v. Commercial Union Ins. Co.,* 478 So.2d 741 (La. App. 3 Cir. 1985) to support its conclusion that the relevant transaction date for the purposes of art. 2521 is not the date the Hospital took possession of the completed facility, but rather the date that the manufacturer, Finestone, put the product into commerce through it distributor.  While the *Theriot* court does not specifically make this holding, the reasoning in it is persuasive to the inquiry in this case, because the court held that the purchaser, who may have not even been involved in the initial purchase of the product, can still recover for breach of implied warranties against the original seller.  In *Theriot,* the court noted that

> . . . a consumer/purchaser without privity may recover against the original seller in redhibition for breach of warranty . . . Civil Code Article 2503 states, in pertinent part, that, "whether warranty be excluded or not the buyer shall become subrogated to the seller's rights and actions in warranty against all others." This language has been interpreted to mean that a consumer/purchaser without privity may recover against the original seller in redhibition for breach of warranty.

*Id.* at 745 – 46 (internal citations omitted).

Additionally, in *Dixie Roofing*, the Louisiana Third Circuit found that the plaintiff school board was entitled to the inference that a redhibitory defect in the roof on its school building existed at the time of sale.  690 So. 2d at 55.  In *Dixie Roofing*, like in this case, the roof's defect did not become apparent until after the roof was sold and installed on the building, where it then promptly shrank after exposure to the elements.  *Id.*

In this case, BASF argues that the point of sale was when the Certificate of Substantial Completion was issued on December 19, 2002.  Thus, because the Hospital accepted the building at that point, even though the EIFS rust was apparent (as noted *supra*, the Hospital first noticed the rust on December 17, 2002), it waived its redhibition claim.  It supports this allegation by citing to several admissions by various parties affiliated with the Hospital, during their

33

depositions, that they assumed that, when the Certificate of Substantial Completion was issued, ownership of the building was transferred from the contractor to the Hospital. The Hospital counters this by producing the construction contract between Bessette and the Hospital, and a companion affidavit from the president of Bessette, in which she states that "at no time did Bessette own the hospital buildings, and at no time did Bessette execute any document translative [sic] of ownership of those buildings."[35]

For the purposes of this argument, BASF appears to present a rather contorted version of the facts to make the argument that the defect was apparent at the "time of the sale," characterizing the Certificate of Substantial Completion as the relevant transaction date. At the time the EIFS was purchased from Finestone through the EIFS supplier, F&W, for installation on the facility, there is no allegation that the rust stains were present. It was not until later, when the EIFS was installed and thus exposed to the elements, that the rust stains became apparent and the defect "manifested" itself. If, instead, the rust had been apparent at the time F&W had shipped out the EIFS, then *of course* the Hospital would not have a valid redhibition claim. But in this instance, it is clear that, *after* the purchase and installation of the EIFS, the defect manifested itself. The Certificate of Substantial Completion date is entirely irrelevant to when the purchase date for the EIFS was for the purposes of ascertaining whether the rust was hidden at that point or not. Construing the evidence in the light most favorable to the Hospital, the defect was hidden at the relevant time of sale, and thus the iron pyrite constitutes a redhibitiory defect.

**B. Prescription of the Hospital's LPLA, negligence, and redhibition claims**

BASF primarily relies on its prescription argument, asserting the argument in its Motion for Summary Judgment and as a counter-argument in its opposition to the Hospital's Partial

---

[35] Aff. of Tobie Hodgins, Ex. B to the Hospital's Resp. to Mot. for Summ J., [Doc. 46-2], at p. 3.

Motion for Summary Judgment.  BASF alleges that the Hospital's negligence, breach of implied warranty against redhibitory defects, and Louisiana Products Liability Act ("LPLA") claims are all prescribed, since the prescriptive period for each of these claims is one year, "whether based on assertions of negligence in the manufacture of the product or in the remediation process."

### 1.  The LPLA and negligence are irrelevant to the Hospital's cause of action.

At the outset, BASF's argument on the prescriptive period for tort-related LPLA and negligence claims is a red herring.  This cause of action is for purely economic damages accruing because of damage to the product itself, and thus falls under the ambit of redhibition, not tort claims.  *See* La. Civ. Code. Ann. art. 2520 ("A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. The existence of such a defect gives a buyer the right to obtain rescission of the sale.").  As one leading treatise on the LPLA explained, when distinguishing a redhibition claim from a tort-related LPLA claim:

> Section 2800.53(5) [of the LPLA] also expands the definition of 'damage' to include 'damage to the product itself and economic loss arising from a deficiency in or loss of use of the product only to the extent that Section 3 of Chapter 6 of Title VII of Book III of the Civil Code, entitled 'Of the Vices of the Thing Sold,' does not allow recovery for such damage or economic loss.' In other words, the LPLA governs products liability in tort and recovery under the statute will normally be limited to recovery for personal injury and damage to property other than the product itself, which properly are the subject of a products liability tort claim. Recovery for damage to the product itself or economic loss arising from a deficiency in or loss of use of the product will normally not be compensable under the LPLA, because those items of damage properly are the subject of a claim in redhibition for breach of implied warranty. If, however, a claimant cannot proceed in redhibition for some reason, he can recover his damages in redhibition under the LPLA. The logical corollary of these rules is that the LPLA was not meant to and indeed does not affect Louisiana's law of rehibition, with one exception: a claimant can recover under the LPLA for damage to the product itself and economic loss when for some reason he cannot proceed in redhibition. This exception in effect expands the action in redhibition.

John Kennedy, *A Primer on the Louisiana Products Liability Act*, 49 La. L. Rev. 565, 580

(1989).  It seems clear in this instance that the Hospital is proceeding under a redhibition claim,

not an LPLA tort claim, because the economic loss arises from the product itself, and not damage

to other property or damage from personal injury.  Further, there is no evidence that the Hospital

cannot proceed in redhibition, which would be the only instance where it would be allowed to

proceed under the LPLA instead.

     For similar reasons, this cause of action does not seem to present a generic tortious

negligence claim.  Even if the undersigned assumed that this cause of action sounded in tort, a

negligence claim would not be available.  The LPLA establishes the exclusive theory for liability

against manufacturers for products liability tort claims, and negligence is not an available theory

of liability under the LPLA.  *See* La. Rev. Stat. Ann. 9:2800.52; *see also Jefferson v. Lead Indus.*

*Ass'n, Inc.*, 106 F.3d 1245, 1251 (5th Cir. 1997).  Accordingly, BASF's arguments relating to the

LPLA and negligence are irrelevant to the Hospital's cause of action.

### 2.  The prescriptive period for the redhibition claim has not expired

     Turning to the parties' arguments on redhibition prescription, BASF asserts that the

Hospital has been aware of the defect in the EIFS since 2002, and thus if the redhibition

prescriptive period began to run from that date, then certainly it ran out by August 2010.[36]  In the

---

[36] The applicable prescriptive period for redhibition under art. 2534 is as follows:

> (2) However, when the defect is of residential or commercial immovable property, an action for redhibition against a seller who did not know of the existence of the defect prescribes in one year from the day delivery of the property was made to the buyer.

> B. The action for redhibition against a seller who knew, or is presumed to have known, of the existence of a defect in the thing sold prescribes in one year from the day the defect was discovered by the buyer.

> C. In any case prescription is interrupted when the seller accepts the thing for repairs and commences anew from the day he tenders it back to the buyer or notifies the buyer of his refusal or inability to make the required repairs.

alternative, assuming the prescriptive period began to run from the last time the parties communicated with each other (the August 5, 2008 letter that Pomarico sent to Finestone, but Finestone allegedly never received), BASF alleges that the prescriptive period has still passed, since the Hospital did not file the lawsuit until over a year and a half later.

The Hospital counters that the prescriptive period did not begin to run because Finestone continued offer the pick and clean remediation process again and again.  It alleges that Finestone failed to comply with the requirements of La. Civ. Code Ann. art. 2534(C),[37] by failing to inform the Hospital that it refused or was unable to make repairs after the alleged stalemate on whether a third pick and clean attempt should be done.  Further, the Hospital notes that it never clearly refused further remediation attempts (and that the August 5, 2008 letter actually offered that the Hospital would try a "sample" pick and clean), indicating that there was still a chance that Finestone might remediate again.  The Hospital argues that the earliest date that the clock could start to run on the prescriptive period was August 19, 2010, the date when Finestone unilaterally closed its file on the Hospital (and thus closed off the chance of further remediation efforts).  The Hospital then cites to the other pick and clean remediation efforts, noting that there was always a long lag period between the Hospital giving Finestone notice of the rust stains and Finestone actually starting the pick and clean process.[38]  Based on this, the Hospital asserts that when "a defendant in a redhibition action consistently assures the plaintiff that it will remedy the problem, and repeatedly attempts repairs, the defendant has not abandoned repair efforts."

---

La. Civ. Code Ann. art. 2534

[37] *See* La. Civ. Code Ann. art. 2534(C), *supra* note 9.

[38] For the first pick and clean, the complaint was lodged in December 2002, but remediation did not occur until May 2003.  For the second pick and clean, the complaint was lodged in December 2004, but the remediation did not occur until May 2006.

BASF replies that, in general, courts addressing interruption of prescription under art. 2534 look to the date repairs were last made to determine when prescription began to run.   Thus, BASF asserts that "there is no mystical quality to the phrase 'abandonment' of repairs . . . prescription occurs when the last repairs are completed."  As such, the last round of repairs was in May 2006, and the prescriptive period began to run from then.   It also argues that the interactions the parties had in 2008 (regarding the third potential pick and clean) could not be clearly seen as a continuance of Finestone's attempts to remedy the problem, particularly because BASF considers the May 2008 meeting as a rejection of Finestone's offer to do a third pick and clean.   BASF further rejects the argument that Pomarico's letter, requesting a "sample" pick and clean, kept the remediation time window alive: it asserts that Finestone never agreed to do a sample pick and clean, and instead only offered to pick and clean the entire Hospital building and Medical Office building.   Concluding, BASF asserts that the Hospital "cannot meet its burden of establishing prescription was interrupted.   Its claims, filed over four (4) years after repairs were last performed and nearly two years after the parties failed to reach an agreement on repairs, are prescribed."

The main issue here is fairly straightforward: when, in the variety of dates offered by the parties, did the prescriptive period on the redhibition claim actually begin to run?   Article 2534, which addresses prescription of redhibition claims, provides:

> A.     (1) The action for redhibition against a seller who did not know of the existence of a defect in the thing sold prescribes in four years from the day delivery of such thing was made to the buyer or one year from the day the defect was discovered by the buyer, whichever occurs first.
>
> (2) However, when the defect is of residential or commercial immovable property, an action for redhibition against a seller who did not know of the existence of the defect prescribes in one year from the day delivery of the property was made to the buyer.

>B.     The action for redhibition against a seller who knew, or is presumed to have known, of the existence of a defect in the thing sold prescribes in one year from the day the defect was discovered by the buyer.
>
>C.     In any case prescription is interrupted when the seller accepts the thing for repairs and commences anew from the day he tenders it back to the buyer or notifies the buyer of his refusal or inability to make the required repairs.

La. Civ. Code. Ann. art. 2534.

First, it is apparent that the redhibition prescriptive period did not begin to run from the time the Hospital discovered the defect in the EIFS 2002: allowing the prescriptive period to run from the date of discovery would entirely ignore Finestone's continued attempts to repair via the pick and clean process, and would punish the Hospital for allowing Finestone to remediate.

The parties have cited several cases to guide the court's inquiry.  For example, in *PPG Indus., Inc. v. Industrial Laminates Corp.*, 664 F.2d 1332 (5th Cir. 1982), a subcontractor sued a supplier of wall panels when it discovered the panels were defective.  *Id.* at 1334.  The supplier attempted to remedy the situation by sending the subcontractor replacement panels, the last of which were received in March 1976.  *Id.*  The Fifth Circuit held that normally, the prescriptive period would begin to run from the date the defect was discovered, but in this instance, it would begin to run from the last time the supplier offered replacement panels.  *Id.*

In *Huckabee v. Sunshine Homes*, 26,294, (La. App. 2 Cir. 12/7/94); 647 So. 2d 409, purchasers of a mobile home made several complaints about the leaky ceiling in their mobile home, purchased in 1984, to the mobile home manufacturer.  *Id.* at 411.  The manufacturer serviced the mobile home several times in 1985 and 1986, finally refusing to service the home again in 1986 because the warranty had expired.  *Id.*  The purchasers continued to have problems with the home, but attempted to repair them themselves because of the manufacturer's earlier refusal to continue repairs.  *Id.*  Eventually, in 1989, the purchasers once again asked the

manufacturer to repair the home, but it once again refused. *Id.* at 412.  The Louisiana Second

Circuit held that the redhibition prescription period began to run in 1986 when the manufacturer

abandoned its attempts at repairs. *Id.* at 413.  It also held that the purchasers' request in 1989 to

do more repairs did not revive the prescriptive period, as the manufacturer had not "clear[ly],

direct[ly], and absolute[ly]" renunciated prescription by taking up repairs again. *Id.*

In *Dixie Roofing*, the Louisiana Third Circuit found that the prescription period for the

plaintiff's redhibition had not expired because the defendant-manufacturer, Firestone, had

continued to offer repairs.  Concluding, the court found that

> We will not penalize the School Board for attempting to remedy the defective
> roof by allowing the defendants to make repairs, rather than immediately filing
> suit. As stated earlier the jurisprudence provides when attempts to repair are
> performed, prescription does not commence until such efforts are abandoned.
> Under the circumstances, the School Board's claims in redhibition against
> Firestone did not prescribe.

*Dixie Roofing,* 690 So. 2d at 54.

This "last date of repairs" rule must be tempered by another rule from Louisiana

jurisprudence that "interruption of prescription will occur when there has been verbal or written

communication which would *reasonably lead a buyer to believe that the defects complained of

would be remedied.*"  *In re Sigma Services Corp.*, 16 B.R. 611 (Bankr. M.D. La. 1981) (citing

*Weaver v. Fleetwood Homes of Mississippi, Inc.*, 327 So. 2d 172 (La. App. 3 Cir. 1976)

(emphasis added).  For example, in *In re Sigma Services Corp.*, the bankruptcy court denied

summary judgment on the defendant's redhibition prescription argument, noting that there was

no evidence to corroborate the plaintiff-buyer's state of mind on whether he believed that the

defendant would remedy problems with a truck he had bought from the defendant. *See id.* at

614.  In *Ory v. A.V.I Const.*, 03-72 (La. App. 5 Cir.5/28/03); 848 So. 2d 115, the Louisiana Fifth

Circuit held that, when a defendant made repeated attempts to repair faulty sheetrock on a

plaintiff's home, and then finally told them he could "do nothing else for them," the plaintiffs'

subsequent letters to the defendant asking for a meeting to resolve the issues did not pause the

redhibition prescription period. *Id.* at 120.

    In this case, the last repairs were done in May 2006, but there is clear evidence that the

parties were still willing to continue the remediation process after that date, and that the Hospital

was under the reasonable belief that remediation would continue.  The parties met again in May

2008 to discuss a potential third pick and clean.  Despite the Hospital's alleged disinterest during

the May 2008 meeting in pursuing a third pick and clean and its and request to instead replace all

of the EIFS, Finestone sent a follow up letter in June 2008, memorializing in writing the offer to

pick and clean a third time.  Pomarico then sent the reply letter in August 2008, requesting a

"sample" pick and clean.  Based on the interactions of the parties, it appears that, construing the

evidence in the light most favorable to the Hospital, the Hospital (through Pomarico) reasonably

believed as of August 2008 remediation would continue.  Pomarico did not completely reject the

offer of a third pick and clean, he simply asked for a sample pick and clean to see if it would be

effective before signing on to a pick and clean of the entire facility.

    The issue of prescription is further complicated by the fact that the Hospital was

accustomed to a long lag time between complaining about the rust and Finestone doing

something about it: as noted *supra,* for the first pick and clean, the Hospital complained in

December 2002, and the pick and clean occurred in May 2003.  For the second pick and clean,

the Hospital complained in December 2004 and the pick and clean did not occur until May 2006,

a full year and a half later.  The Hospital explained during oral argument that because it was

accustomed to such a long lag time, it did not immediately check with Finestone about the pick

and clean process after the June 2008 and August 2008 letters.  Additionally, it asserted that

Finestone continued to mislead it into thinking that the pick and clean process would eventually work, thus advising against filing suit.

In this case, there is evidence that the Hospital reasonably believed that remediation would continue after the August 2008 letter, thus pausing the prescriptive period on any redhibition claim.  Construing the evidence in the light most favorable to the plaintiff, the undersigned cannot find that this fact pattern necessitates dismissal of the Hospital's redhibition claim by reason of prescription.

**C.   Breach of Implied Warranty for Fitness for Ordinary Use under Article 2524**

**1.   Article 2524 applies to the Hospital's claims.**

**(a) Rust on the EIFS renders it "unfit for ordinary use" under article 2524, and article 2524 and redhibition claims are not mutually exclusive**

BASF notes that the Hospital has asserted a claim under La. Civ. Code Ann. art. 2524, alleging that BASF has breached the warranty that the EIFS is fit for ordinary use.  BASF first asserts that the Hospital has acknowledged that the EIFS is capable of its ordinary use under art. 2524 – being used as a wall cladding system – and thus it does not have a viable art. 2524 claim. Related to this, BASF asserts that Louisiana law only allows a claim for breach of contract for fitness of ordinary use under art. 2524 when an item is free of redhibitory defects.  Since the Hospital is claiming the rust stains as a redhibitory defect, therefore, the Hospital's art. 2524 claim must fail.

The Hospital counters that BASF ignores a basic requirement for the EIFS in concluding that it was still "fit for ordinary use" under art. 2524: that the walls were also chosen to have a specified color and texture, and that BASF markets and specifically warrants the aesthetic nature of the EIFS wall system.  As such, the aesthetic nature of the wall was a "critical component," and thus the EIFS was not fit for ordinary use when it became rusty and lost its color. The

Hospital also counters that BASF is incorrect in asserting that claims under art. 2524 and 2520 are mutually exclusive: citing to an unpublished 2011 case decided by Judge Drell, *Justiss Oil Co., Inc. v. T3 Energy Servs., Inc.*, no. 1:07-cv-017452011 WL 539135 (W.D. La., Feb. 7, 2011), the Hospital asserts that the majority of Louisiana Appellate Courts have found that a party can assert both a claim for breach of warranty against redhibitory defects under art. 2520 and a breach of warranty for fitness for ordinary use under art. 2524.

BASF replies that it is still clear, based on the facts, that the EIFS is fit for its ordinary use (as an exterior cladding system), and that the Hospital is once again confusing a redhibitory action with an art. 2524 action.  BASF also argues that the real reason the Hospital is making an art. 2524 claim is because the prescriptive period is longer (ten years) than the prescriptive period for a redhibition claim (one year), and the redhibition claim has already gone stale.  BASF also notes that in the *Justiss* case the Hospital cites for the proposition that art. 2524 and redhibition claims are not mutually exclusive, all of the cases the *Justiss* court cited for that proposition were decided before art. 2524 was enacted, which was specifically intended to clarify confusion between redhibition and art. 2524 claims.  Citing to a Louisiana Third Circuit case, *Cunard Line Ltd. Co.v. Datrex, Inc.*, 05-1171, (La. App. 3 Cir. 4/5/06); 926 So. 2d 109, BASF notes that when a plaintiff asserts both a redhibition claim and an art. 2524 claim, and it is clear that the art. 2524 claim is only asserted to take advantage of the longer prescriptive period, the art. 2524 claim will be subsumed by the redhibition claim.

This issue presents an interesting question that the Louisiana Supreme Court apparently has not yet been answered: when a party alleges that a product has a redhibitory defect (art. 2520), can it also argue that the redhibitory defect renders the product unfit for its ordinary use (art. 2524)?

Article 2524 provides:

The thing sold must be reasonably fit for its ordinary use.

When the seller has reason to know the particular use the buyer intends for the thing, or the buyer's particular purpose for buying the thing, and that the buyer is relying on the seller's skill or judgment in selecting it, the thing sold must be fit for the buyer's intended use or for his particular purpose.

If the thing is not so fit, the buyer's rights are governed by the general rules of conventional obligations.

La. Civ. Code Ann. art. 2524.

Article 2524 was enacted in 1995, and the Revision Comments further provide:

(a) This Article is new. It does not change the law, however. It gives express formulation to the seller's obligation of delivering to the buyer a thing that is reasonably fit for its ordinary use. The Louisiana jurisprudence has recognized the existence of that obligation although, in most instances, it has been confused with the warranty against redhibitory vices.

(b) Under this Article when the thing sold is not fit for its ordinary use, even though it is free from redhibitory defects, the buyer may seek dissolution of the sale and damages, or just damages, under the general rules of conventional obligations. The buyer's action in such a case is one for breach of contract and not the action arising from the warranty against redhibitory defects.

*Id.*

As discussed *supra*, a redhibitory defect is defined as something that renders a product "useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect [or] without rendering the thing totally useless, it diminishes its usefulness or its value so that it must be presumed that a buyer would still have bought it but for a lesser price." La. Civ. Code Ann. art. 2520.

BASF relies on the reasoning from the 2006 Louisiana Third Circuit case, *Cunard*, for the proposition that art. 2520 claims and 2524 claims are mutually exclusive. In *Cunard*, a cruise ship owner (Cunard) bought a lighting system from a supplier (Dartex) for its line of

44

cruise ships. *Cunard*, 926 So. 2d at 111. The lighting systems were defective and shorted out,

however, prompting Cunard to sue Dartex. *Id.* Dartex then filed an exception of prescription,

arguing that since Cunard had brought a redhibition claim, and more than one year had passed

since discovery of the defect, Cunard's claim was prescribed. *Id.* Cunard argued that instead it

was bringing an art. 2524 claim, which had a ten year prescriptive period, and thus prescription

had not run. *Id.* at 111 – 12. The trial court agreed with Dartex, and granted the exception of

prescription. *Id.* On appeal, the Louisiana Third Circuit first noted that while some of the

language in Cunard's petition seemed to indicate that the lighting system was "not fit for

ordinary use" on a cruise ship, this assertion was based on the reasoning that it was not fit for

ordinary use because the lighting system was defective in design. *Id.* at 113. Continuing, it

noted that

> Regardless of the language in which Cunard couched its cause of action, it is
> evident that Cunard's cause of action arose out of the allegedly defective
> condition of the [lighting] systems. Importantly, Cunard did not contend that a
> properly functioning Datrex [lighting] system would fail to meet either IMO
> requirements or Cunard's needs or purposes. Rather, essentially, Cunard alleged
> that the Datrex [lighting] systems at issue were not suitable for ordinary use or for
> Cunard's intended use or particular purpose because they were defective.

*Id.* The court then reviewed the legislative history of art. 2524 to determine whether 2524 or

2520 applied to the cause of action, or both, and found that the Louisiana legislature had

intended to create a separate and distinct cause of action from art. 2520 by enacting art. 2524.

*Id. at* 113-14.

In contrast, the Hospital leans heavily on the reasoning from the *Justiss* case, which

distinguished itself from *Cunard*, to support its arguments here. In *Justiss*, Judge Drell

addressed whether the owner/operator of a well, who alleged that a defective well head

component had ruined fracking operations, could assert both a claim for breach of warranty

against redhibitory defects under art. 2520 and a breach of warranty for fitness for ordinary use under art. 2524. *Justiss*, 2011 WL 539135 at *1.  In finding that the plaintiff could assert both causes of action, Judge Drell first noted that he would reject the reasoning in *Cunard* and instead follow the "majority of Louisiana appellate courts," which had found that an art. 2520 and art. 2524 claim were not mutually exclusive. *Id.* at *5.  Further, Judge Drell specifically distinguished *Cunard* from the *Justiss* case, noting that in *Cunard*, the court was required to decide whether either art. 2520 or 2524 applied because the prescriptive periods were different and the shorter prescriptive period for the art. 2520 claim expired.  *Id.* Concluding, Judge Drell noted that

> Here we face no such dilemma, as [the plaintiff] has brought its claim within the prescriptive period for both theories. Accordingly, we find no reason to deem the two articles exclusive, nor otherwise not to apply the "well-settled" rule that "the same acts or omissions may constitute breaches of both general duties and contractual duties and may give rise to [actions in both tort and] contract." E.g., *In re St. Louis Encephalitis Outbreak in Ouachita Parish,* 939 So.2d 563, 566–67 (La.App. 2 Cir 2006). Based on that rule, Louisiana law has long held that, absent conflicting prescriptive periods, a plaintiff may assert claims under both theories and is not required to plead a single theory of his case. E.g., *Dubin v. Dubin,* 641 So.2d 1036, 1039–40 (La.App. 2 Cir.1994).

*Id.* at *6.

As in the *Justiss* case, the undersigned declines to follow the holding in *Cunard*.  First, like in *Justiss,* the court has found that the one-year prescriptive period on the Hospital's redhibition claim has not expired, and thus the Hospital is free to assert claims under both art. 2520 and art. 2524 in the absence of conflicting prescriptive periods.  Further, while BASF argues that rust on the EIFS is simply a redhibitory defect and that this defect does not render the EIFS unfit for ordinary use, the undersigned is persuaded by the Hospital's argument that a main criteria for the EIFS was for it to be aesthetically pleasing.  An exterior wall which is riddled

46

with rust spots is certainly not fit for the ordinary use of presenting a certain aesthetic to the outside world.  Accordingly, the Hospital has pled a valid art. 2524 claim.

### (b) Article 2524 does not require a buyer/seller contractual relationship.

Next, BASF argues that the Hospital does not have a contractual relationship with BASF that would trigger the provisions of art. 2524, and that art. 2524 requires a relationship between a "buyer" and a "seller."  Here, BASF asserts that the Hospital was not the "buyer" of the EIFS, "but rather acquired [it] as a component part of the New Hospital buildings via a contract of construction."

The Hospital counters that BASF is incorrect in arguing that art. 2524 requires privity of contract between a buyer and a seller.  It asserts that in this instance: Finestone put the EIFS materials into commerce; then, the intermediaries (F&W and Robbins) installed it; and finally, the Hospital received the finished project.  Just because there was a "middleman" between the buyer-Hospital and seller-Finestone, this does not shield BASF from liability.

Much like BASF's argument that a redhibition claim requires a direct buyer/seller relationship, the undersigned also finds here that BASF's reading of the buyer/seller component of art. 2524 is too limited to be persuasive and is in contravention to established jurisprudence in Louisiana.  *See Media Production Consultants, Inc. v. Mercedes Benz of N. America, Inc.*, 262 So. 2d 377, 381 (La. 1972) (holding that a consumer without privity can recover against Mercedes-Benz, the car distributor, even though the plaintiff bought the car through a "conduit"/franchise dealer).  In this case, while the Hospital bought the EIFS through intermediaries (F&W selling the EIFS to Robbins, who then installed it on the facility), this lack of direct privity cannot shield BASF from liability under art. 2524.

### 2. The LPLA is irrelevant to this cause of action, and thus has no effect on the art. 2524 claim

BASF concludes that a claim under art. 2524 and is "subsumed and precluded by the LPLA," which, as argued above, has a prescriptive period of one year.  For the reasons discussed *supra*, this is not an LPLA claim.  The damage asserted here is to the product itself, not damage to other property or damage from personal injuries (which sounds in tort).  Further, the undersigned agrees with the Hospital that there is an essential element missing here which is required for an LPLA claim: unreasonable dangerousness.  Thus, this LPLA argument is irrelevant.

**D.   Effect of the Hospital's failure to report the rust within thirty days, as per the dictates of the written warranty, and effect of Robbins performing remediation work on the Utility building**

Next, BASF argues that the Hospital does not have a valid claim against BASF under the written EIFS warranty[39] because it failed to comply with the warranty's terms and conditions.  It notes that the Hospital breached the warranty by failing to notify BASF within thirty days of the rust stains, and that the first time the stains appeared, the Hospital did not complain about them until a year and a half after they had first become visible (May 2003 – December 2004).  After the second remediation effort, the Hospital was allegedly guilty of a lapse between seeing the stains and complaining (May 2006 – end of 2007).  BASF also avers that, because Robbins used non-BASF products to repair the Utility building in 2005, this frees BASF from any obligation to fix the Utility building because Robbins using non-BASF products violates an express term of the warranty.  BASF argues that the Robbins alterations "caused additional and distinctive stains/blemishes to the exterior cladding of the building, causing it to be worse in appearance than the other buildings."

---

[39] *See* Warranty, *supra* footnote 10.

The Hospital counters that "there is no dispute that [the Hospital] made its original complaint to [Finestone] timely and that [Finstone] accepted liability."  It asserts that the rust spots appeared gradually over time, and that, after the first pick and clean process, it had been advised by Finestone to "wait and see" whether new rust spots would develop, which explains why it waited a long time to complain after the first and second pick and clean procedures.  It further notes that at no time did Finestone assert the thirty-day limitation, instead opting to acknowledge responsibility for the problems and trying to fix it via the pick and clean process. In regards to the Utility building, the Hospital asserts that nothing Robbins did to remediate the Utility building post Hurricane Rita caused the rust stains.  Instead, all fault remained with Finestone, because the stains were solely caused by the iron pyrite which had always been in the EIFS.

As noted earlier in this ruling, the Hospital has a clear excuse for not objecting within the thirty day time window: the rust slowly appeared over time.  The Hospital complained almost immediately the first time the rust stains appeared in December 2002.  Additionally, there is evidence that Finestone told the Hospital to wait and see whether the rust issue would get worse or not after the first and second pick and clean attempts.  Construing the evidence in the light most favorable to the Hospital, there is plentiful evidence that the Hospital waited to act because of Finestone's continued offers of repairs.  A finding now that the Hospital waived its rights under the warranty because it failed to assert them within the thirty-day time window would essentially penalize the Hospital for allowing Finestone to continue to offer repairs.

Further, summary judgment on the issue of whether BASF is liable for the problems with the Utility building is premature.  There is a contested issue of material fact on whether the rust

stains were solely caused by the manufacturing defect in the EIFS or else by negligence on the part of Robbins instead.

### E. BASF's right to pick between two options in written warranty

BASF's final argument is that, if the court determines that the Hospital has a written claim under the EIFS warranty, it has the right, per Louisiana law and the EIFS Limited Warranty, to choose between the two alternative options set forth in the warranty (either replacement of the coatings or refund of the purchase price). Thus, if the court decides that BASF is liable under the express warranty, BASF wishes to pick the option of refunding the purchase price of the EIFS ($22,960.00).

BASF's arguments operate on the assumption that the written EIFS Limited Warranty is absolutely binding on the parties, and thus it gets to choose which remedy option it can offer to the Hospital. As noted *supra*, there are clear problems with the EIFS warranty, however, which render the limitations on remedies ineffective. Accordingly, BASF's arguments in this portion of its motion are moot.

### CONCLUSION

In conclusion, the court grants the Hospital's motion, finding that the Limited Warranty's exclusion of implied warranties and limitation of express remedies are unenforceable. Additionally, the court denies BASF's motion, finding that the Hospital has valid redhibition and art. 2524 claims, that the redhibition claim is not prescribed, that the Hospital's failure to assert a breach of warranty within the thirty-day window prescribed by the Limited Warranty has no effect on the Hospital's claims, and that it is premature to grant summary judgment on whether BASF is liable for the damage to the Utility building.

Lake Charles, Louisiana, this ___ day of _____ 2013.

_____
PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE